a

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| DEONTAY DESHUN HARDY #702823, Petitioner | CIVIL DOCKET NO. 1:24-CV-01438 SEC P |
| VERSUS | JUDGE EDWARDS |
| TIM HOOPER, Respondent | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1) filed by pro se Petitioner Deontay Deshun Hardy ("Hardy"). Hardy is an inmate in the custody of the Louisiana Department of Corrections, incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. Hardy challenges his conviction and sentence imposed in the Tenth Judicial District Court, Natchitoches Parish.

Because Hardy's Petition is meritless, it should be DENIED and DISMISSED WITH PREJUDICE.

I. **Background**

Hardy was convicted of armed robbery and attempted armed robbery. ECF No. 1 at 1. On January 26, 2021, he was sentenced to a total of 140 years of imprisonment. *Id.* Hardy's conviction was affirmed on appeal, but the case was remanded for resentencing due to an improperly imposed five-year enhancement.

1

*State v. Hardy*, 2021-105 (La.App. 3 Cir. 7/13/22); 344 So.3d 821. The Louisiana Supreme Court denied writs. *State v. Hardy*, 2022-01264 (La. 11/16/22); 349 So.3d 1001.

Hardy alleges that he filed an application for post-conviction relief in the trial court and sought review in the court of appeals. ECF No. 1. However, he claims to be unaware of the dates of decisions or case numbers. He also does not allege that he sought post-conviction review in the Louisiana Supreme Court.

Hardy alleges that he was not advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); there was no probable cause for his arrest; the trial court failed to suppress certain evidence and testimony; and there was insufficient evidence to convict him. ECF No. 1.

II. <u>Law and Analysis</u>

    A. <u>Hardy's Petition is subject to screening under Rule 4 of the Rules Governing § 2254 Cases.</u>

Rule 4 of the Rules Governing § 2254 Cases provides that, following an examination of the pleadings by a court, "'[i]f it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the petitioner to be notified.'" *See Kiser v. Johnson*, 163 F.3d 326, 328 (5th Cir. 1999) (quoting the Rules Governing § 2254 Cases).

B.     Hardy does not meet his burden under § 2254(d).

A federal court may only grant habeas relief if the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2). A state court decision is deemed "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Jenkins v. Hall*, 910 F.3d 828, 832 (5th Cir. 2018) (internal quotations omitted) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)).

"It is an unreasonable application of Supreme Court precedent 'if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Id.* (quoting *Salts v. Epps*, 676 F.3d 468, 473–74 (5th Cir. 2012)). The "state court's findings of fact are entitled to a presumption of correctness" that may be overcome only by "clear and convincing evidence." *Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005).

3

### 1. Hardy does not meet his burden as to his *Miranda* claim.

Hardy alleges that he was not properly advised of his rights under *Miranda*. He asserts that a review of the body camera of the arresting officer would prove his claim.

In *Miranda*, the United States Supreme Court instituted pre-interrogation warnings by precluding the use of a defendant's statements obtained during custodial interrogations unless certain warnings are first given to the defendant:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda*, 384 U.S. at 444; *see also Dickerson v. United States*, 530 U.S. 428, 443–44, (2000). In the absence of these warnings or their "fully effective equivalent," statements obtained during custodial interrogations cannot be used as evidence of a defendant's guilt. *Miranda*, 384 U.S. at 476.

In addressing Hardy's claim, the Third Circuit Court of Appeal quoted from Hardy's pleadings:

> Petitioner asserts that arresting officer having no description of the alleged assumed suspects he's giving chase after and then calling in on dispatcher losing sight of these suspects for over three minutes, then just encountering an individual putting him in handcuffs, interrogating, and searching him without informing him he's detained or under arrest, unreasonably searched and seized him in violation of his 4th Amendment Right of the U.S. Constitution; and his Louisiana

4

> Constitution of 1974 decleration [sic] Right Act. 1, Section 5 and 13, on scene.

*Hardy,* 344 So.3d at 837. At a hearing on a motion to suppress, the trial court heard testimony from Corporal Guin and Lieutenant Pinkney. According to the appellate court:

> Corporal Guin testified like his trial testimony, noting that he pulled up to the house next to Southern Classic and immediately jumped out of his car and gave chase to two individuals who came around the fence from the restaurant and immediately ran away from him. Corporal Guin stated he chased Defendant and another individual through multiple backyards, going over fences and through bushes before apprehending Defendant. At the time he detained Defendant, Corporal Guin noted Defendant had a phone in his pocket and a wallet on him, noting he procured the phone when it rang. Corporal Guin testified that after initially detaining Defendant, he transported Defendant to the police department; at that time Corporal Guin read Defendant his *Miranda* rights and Defendant signed a waiver of rights form.
>
> Lieutenant Pinkney then testified that, prior to his first personal interaction with Defendant, he obtained the signed waiver of rights form Defendant had signed with Corporal Guin. He then met Defendant at the hospital and asked Defendant if Gerald Jimmerson ("Jimmerson") was with Defendant "at the time of the incident" and Defendant replied that Jimmerson had been present. Lieutenant Pinkney testified he did not ask Defendant any other questions at the time. Lieutenant Pinkney acknowledged that an interview would normally have happened in a recorded interview room but noted Defendant "was in the hospital not about to be released and it was urgent information pertaining to a suspect on the loose with the gun or considered armed and dangerous."
>
> Contrary to what was proven by the body camera footage viewed by the jury during trial, Corporal Guin initially testified that he did not answer Defendant's phone or speak to anyone on it, that Defendant had not made any statements to him at the time of his arrest, and that he did not ask him any questions at the time he apprehended him. Defense counsel partially impeached Corporal Guin's testimony with a portion of the body camera footage. In that regard, we take note of the conversation that occurred between Corporal Guin and Defendant upon his apprehension. When asked if his partner had his gun, Defendant told Corporal Guin, "It was him who had a gun." Corporal Guin then

5

> asked for the other man's name, to which Defendant replied "[y]ou not gonna let me go, so fuck you."
>
> At the suppression hearing, we find the record shows trial counsel's argument presented only unsupported claims that Defendant "may have very well reasserted his *Miranda* rights and his sixth amendment rights," and an argument that Corporal Guin's testimony lacked credibility.

*Hardy*, 344 So.3d at 835–36.  The appellate court further stated:

> Ultimately, we find there is no evidence to suggest Defendant's statement to Lieutenant Pinkney was not voluntarily made. Despite Defendant's contrary contention, his signature on a waiver of rights form shortly before Lieutenant Pinkney spoke with him evidences otherwise.

*Id.* at 836.

Corporal Guin's body camera footage was shown to the jury at trial and used by Hardy's attorney to partially impeach the officer. However, the only statement Hardy made prior to the administration of his *Miranda* warning was a statement implicating Jimmerson. All subsequent statements were made after Hardy signed a waiver of his rights.

The state court determined that the statement made at the hospital was voluntary, and that Hardy had waived his right to contest the admissibility of any other evidence when he failed to raise other grounds in a motion to suppress. Hardy does not establish that the state court's finding was contrary to or an unreasonable application of federal law or resulted in a decision that was based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings.

      2.      <u>**Hardy cannot establish a Fourth Amendment violation regarding his arrest or the failure to suppress evidence.**</u>

Hardy alleges that the officers lacked probable cause for his arrest, so all subsequent statements and evidence should have been suppressed. To obtain relief in federal court for a violation of the Fourth Amendment, a petitioner must plead and prove that the state court proceeding was inadequate and did not provide a full and fair opportunity to litigate his Fourth Amendment claim. *See Davis v. Blackburn*, 803 F.2d 1371, 1372 (5th Cir. 1986) (per curiam); *see also Stone v. Powell*, 428 U.S. 465, 494 (1976) ("Where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."). As discussed above, the trial court conducted a pre-trial hearing addressing Hardy's claims. Because Hardy was provided a full and fair opportunity to litigate his claims, federal review is barred.

      3.      <u>**Hardy's insufficient evidence claim is meritless.**</u>

Hardy asserts that there is insufficient evidence to support his conviction. The state courts properly evaluated his claim under *Jackson v. Virginia*, 443 U.S. 307 (1979). The appellate court summarized the evidence as follows:

> The State's first witness was Mr. Smith who testified that on May 1, 2016, he was at Southern Classic because his wife, Mrs. Smith, was the manager of the restaurant. Mr. Smith stated that he and his two children, both under the age of ten, were in the parking lot waiting for Mrs. Smith to get off work. According to Mr. Smith, one of his children mentioned a "man with the mask on" right before two individuals opened his door and yelled at him to turn off the light. Mr. Smith testified both men had masks on, were wearing black and blue clothing, and were carrying firearms which they pointed at Mr. Smith and his

children. Mr. Smith stated the individuals took his keys and his cellphone.

According to Mr. Smith, the individuals waited beside his car after they got his keys and cellphone until someone opened the door to the restaurant, at which time they ran into the restaurant. Mr. Smith and his children jumped out of the car, ran to a nearby Checkers and called 9-1-1; at this point, he was informed that officers were already on the way. Hearing a gunshot, Mr. Smith left his children at Checkers and ran back toward Southern Classic. He then saw the two individuals who had confronted him run out the side door of the restaurant. He also saw the newly arrived police officer in hot pursuit. Mr. Smith noted that he was unable to identify either of the individuals who robbed him with any more particularity.

Mr. Michael Allen Bodenhamer ("Mr. Bodenhamer"), a technician for Brown's Security and Life Safety Systems, also testified. Mr. Bodenhamer stated that he installed a security system at Southern Classic in 2016. According to Mr. Bodenhamer, he received a work order on May 2, 2016, to pull footage from the surveillance system, which he copied to a thumb drive and provided to the Natchitoches Police Department. The State then introduced sixteen videos into evidence which were pulled from different surveillance cameras at Southern Classic. These videos were then published for the jury to view.

Mr. Chester Bradford ("Mr. Bradford"), a cook employed at Southern Classic for over twenty years, also testified. On the night of the robbery, Mr. Bradford was checking to make sure the doors were locked, and the stoves were turned off as the restaurant was closing for the day. According to Mr. Bradford, he locked the front door and was returning to the back of the restaurant when he heard a whistle and a man with a pistol ordered him to lay down on the floor. Mr. Bradford testified he was joined shortly thereafter by two of his coworkers who were being watched by one perpetrator while the other was in the back of the restaurant with Mrs. Smith, the manager, and the cashier. He stated the individual watching him yelled that he was leaving when the second individual started leaving and there was a gunshot. According to Mr. Bradford, both individuals left at that point, although he subsequently heard "another shot in the front of the build[ing] and then they w[ere] gone."

Mr. Bradford recalled the individuals were wearing hoodies and masks, stating he believed one was wearing grey and the other black. He did not recall that the individuals were wearing gloves, although he

8

admitted he "wasn't really looking that close." He noted on cross-examination that he was unaware of anything being taken from anyone inside the restaurant as they did not keep cash in the building, and the employees were not able to open the safe.

Mrs. Smith was the next to testify. Mrs. Smith stated that although she had left Southern Classic about two years prior to trial, she worked there for roughly thirteen years and that she was a manager at the time of the robbery in May of 2016. Mrs. Smith testified that when one of the girls working at the restaurant exited the door, two men with guns ran inside, tried to force her to open the safe, and were "trying to rob" the employees at gunpoint. According to Mrs. Smith, both men had masks, black hoodies, blue gloves, and were carrying guns. Mrs. Smith further testified that the two men threatened to kill her if she did not open the safe. However, she stated that the men were unable to get any money out of the safe because it jammed. She noted one individual told the other they needed to leave because the police were coming. Mrs. Smith also stated the two men shot one of the doors in order to get out of the restaurant. Mrs. Smith then identified herself in one of the surveillance videos that the State previously introduced. She acknowledged the robbers got no money from the restaurant.

The State then called Ms. Marilyn Nash ("Ms. Nash") who testified that she was working at Southern Classic as a cashier and doing kitchen duties on May 1, 2016; she stated she had worked at the restaurant about nine years. Ms. Nash testified that after she finished her closing duties, she clocked out and was waiting for the rest of the employees to finish when two guys came into the restaurant with guns. At that point, she "took off through the back door and braced the door" before calling 9-1-1. She described the individuals as wearing all black, including black masks; she did not recall them wearing gloves but did recall they both had guns.

Corporal Guin testified that although he now works for the Red River Parish Sheriff's Office, he worked at the Natchitoches City Police Department for about six-and-a-half years, including May 1, 2016. Corporal Guin stated that he had just turned onto Texas Street when a call came in regarding a robbery-in-progress at Southern Classic on Texas Street. Unaware of the extent of the situation, he parked his unit at the driveway of the house next to the restaurant so that it would be out of sight. According to Corporal Guin, he observed two men come around the corner of the fence near the restaurant; they were wearing dark-colored hoodies, and this occurred less than a minute after the robbery was reported. He testified that he jumped out of his unit and

chased after the individuals on foot. Referencing an enlarged map of the area, Corporal Guin then traced his path following the individuals through numerous backyards and over multiple fences:

> Okay, so, again they come around this fence right here and they ran through this driveway. And there is a fence at the back of this property, there was a hole in it. They went through that hole and I followed them through that hole. They ran this way and there was actually a gentleman standing outside, I never identified him, never saw him again. I kind of saw them making the corner and he said they went that way. So, I turned and followed them down this street. I'm sorry I've got to look at it. It's kind of upside down. And then they turned into this field and ran down this line. So, this whole yard is fenced. I saw them hop over this fence. At that time, I lost sight of them. I was trying to see where they came out. Then I saw them jump this fence into these bushes. At that time, I waited, I found a tree, got cover. I didn't want to go in the bushes because as far as I knew they were armed. At least I believed they were. When I heard them, I heard, I could hear them going over the fence through the bushes and going over the fence. So, after they did that, I could hear, it sounded to me like metal and stuff on the other side. I went into the bushes, there was a large like a 7-foot wood fence there. So, I jumped over this fence that they came over initially and then I came over this back fence. At that time Mr. Hardy ran from behind the shed running across the yard. It's hard for me to tell, I was running, but I believe that there is an actual **13 trailer right there now, or was. I believe he ran in between that trailer and that house and he, I apprehended him right there.

Corporal Guin further noted that he got behind Defendant as Defendant ran past the shed, yelled at Defendant to freeze, then chased him around the corner of the building where Defendant finally complied with his instructions to stop and put his hands up. Corporal Guin noted that Defendant was carrying a phone and a wallet; he also noted a picture of a girl came up on the phone which matched a picture in the wallet. According to Corporal Guin, Defendant was wearing "[d]ark colored sweat clothing" when he was arrested, and also noted that Defendant "had a piece of blue glove on his hand." Corporal Guin testified that when he arrived at the Natchitoches Police Department, Defendant was informed of his *Miranda* rights, and voluntarily waived those rights.

10

Corporal Guin stated that he then returned to Southern Classic, and he retraced the path of his chase of Defendant to recover additional evidence. While retracing his steps, Corporal Guin recovered two blue gloves along the route as well as a blue LG flip phone at the location where he arrested Defendant. Corporal Guin noted the wallet he recovered from Defendant at the time of the arrest had approximately one thousand dollars in it, all in twenty-dollar bills. He stated he was unaware of whether there was any proof regarding the origin of the cash. Lieutenant Victor Pinkney ("Lieutenant Pinkney") of the Natchitoches Police Department was the next to testify. Although Lieutenant Pinkney now oversees shift patrol, he noted that he was an investigator in the Natchitoches Police Department's high-tech crime unit at the time of the robbery on May 1, 2016. He noted that, as part of his training for the high-tech crime unit, he was trained in cellphone analysis. Lieutenant Pinkney testified that upon his arrival at Southern Classic, he was presented with two phones: a Samsung Galaxy smartphone which belonged to Defendant and the flip phone which was believed to belong to a Mr. Gerald Jimmerson. He testified he placed the phones in airplane mode to prevent tampering and then placed them in a "chamber" where they could not receive a signal until he could obtain forensic search warrants.

Lieutenant Pinkney's testimony was that he procured both a physical search warrant for Defendant's phone and a search warrant for the call detail records (CDRs) from AT&T. Lieutenant Pinkney noted that because AT&T's CDRs use "precession location" one is able to determine the actual location of the cellphone, not just which tower it used to transmit. Although Lieutenant Pinkney testified that he did some cellphone analysis within days of the robbery, he stated he was not able to use the CDRs to pinpoint the phone's location until 2018 when enhanced technology was available. According to Lieutenant Pinkney, his analysis identified the owners of the phones, established communications between the phones going back months before the robbery, and proved that both phones were at Southern Classic at the time of the robbery. Specifically, Lieutenant Pinkney noted:

> I was able to map through precision location from AT&T that they were behind Southern Classic at minutes before the crime took place. I mapped them coming out of Southern Classic while the crime was going on. And I mapped part of the pursuit after the crime was committed. I was able to map part of that. And after that of course we got possession of the phone.

11

> Lieutenant Pinkney acknowledged that he was not able to do a pinpoint location of the cellphones inside Southern Classic, which he blamed on signal distribution from the building because it contained a large amount of tin. However, he testified that he did map the phones right outside the doors of the restaurant at times consistent with the entry and exit of the robbers. Lieutenant Pinkney also testified that through his basic phone analysis he was able to establish communication between the two phones, including multimedia messages (MMS) referencing firearms "similar to the weapons that are on surveillance."
>
> Lieutenant Pinkney testified that when he left the crime scene, he went to the Natchitoches Police Department to speak with Defendant. At that time, he was informed by Corporal Guin that Defendant had been transported to the hospital, had signed a waiver of rights form, and that he wanted to speak with Lieutenant Pinkney. According to Lieutenant Pinkney, he went to Defendant's hospital room and asked if Mr. Jimmerson had been with him. At that time, Defendant confirmed Mr. Jimmerson's presence before stating that he was hurting and in pain, at which time Lieutenant Pinkney asked no further questions. Lieutenant Pinkney testified three .380 shell casings were recovered at the restaurant but that they did not contain DNA evidence; he also confirmed no fingerprints or DNA evidence was recovered from the restaurant, noting, however, that "surveillance clearly showed that they were wearing gloves and covered up." He confirmed that no money was reported stolen from the restaurant, and no one was able to identify the robbers. On cross-examination Lieutenant Pinkney acknowledged that he could not say that either cellphone had been inside Southern Classic but noted he could say they were right outside the side door.

*Hardy*, 344 So.3d 821, 829–33.

The state courts determined that there was sufficient evidence that Hardy was one of the individuals who committed the robbery even though he was never selected from a line-up and Jimmerson did not testify at trial. *Id.* Mr. Smith testified that two men robbed him in the Southern Classic parking lot before entering the side door of the restaurant when an employee exited the restaurant door. *Hardy*, 344 So.3d 821, 829–33. The court found that video evidence corroborated Mr. Smith's testimony. The video showed one employee of the restaurant walk through the door

12

while another employee attempted to close the door behind her.  Next, two men rush the door, pointing guns at both employees while the employee that was already outside runs away.  Mr. Smith also testified he saw the same men come out of the restaurant at the same time Corporal Guin arrived and immediately saw Corporal Guin as he began chasing them.  *Id.*

The appellate court further concluded that the surveillance videos clearly showed both men wearing gloves and carrying firearms inside the building; one of the individuals firing his weapon toward the front door multiple times; and both men running from the restaurant toward Texas Street.  *Hardy*, 344 So.3d 821, 829–33.

The court determined that Corporal Guin's body camera footage revealed him arrive on the scene, jump out of his car, and immediately begin pursuing the two men who exited Southern Classic on foot.  While it is clear from the video that Corporal Guin lost sight of the suspects at least twice, he testified that he was following the sounds of the two individuals as they jumped fences and ran through numerous yards.  Furthermore, at the time of apprehension, Hardy's right hand had the torn remains of a blue latex glove on it.  *Id.*  The appellate court also recounted that Lt. Pinkney was able to trace Hardy's cell phone immediately outside the restaurant at the beginning and end of the robbery, as well as along the route Corporal Guin chased the suspects.  The appellate court concluded that, considering the testimony and evidence in the light most favorable to the prosecution, a rational juror could have found the state proved beyond a reasonable doubt that Hardy was one of the

13

individuals who robbed Mr. Smith and attempted to rob Southern Classic and Mrs. Smith.

Hardy does not establish that the ruling was contrary to or an unreasonable application of *Jackson.*

### III. Conclusion

Because Hardy cannot meet the requirements of § 2254, IT IS RECOMMENDED that the Petition be DENIED and DISMISSED WITH PREJUDICE.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a circuit justice or district judge issues a certificate of appealability, an appeal may not be

taken to the court of appeals. Within 14 days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

SIGNED on Wednesday, April 23, 2025.

_____
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE